RECEIVED
IN ALEXANDRIA, LA.

JUL 1 6 2014

TONY R. MOORE, CLERK
BY _____ DEPUTY

13-cv-00785-JTT    Document 14    Filed 07/16/14    Page 1 of 25 PageID #: 365

UNITED STATES DISTRICT COURT                    b

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

MICHELLE RENEE LONGLOIS,                CIVIL ACTION
                    Petitioner          NO. 1:13-cv-00785

VERSUS

U.S. COMMISSIONER OF SOCIAL             JUDGE JAMES T. TRIMBLE
SECURITY ADMINISTRATION,                MAGISTRATE JUDGE JAMES D. KIRK
                    Respondent

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Michelle Renee Longlois ("Longlois") filed an application for disability insurance benefits ("DIB") on July 22, 2010, when she was 40 years old, alleging a disability onset date of October 31, 2009 (Tr. p. 118) due to lower back pain, diabetes, depression, and arthritis (Tr. p. 138). That application was denied by the Social Security Administration ("SSA") (Tr. p. 67).

A de novo hearing was held before an administrative law judge ("ALJ") on September 6, 2011, at which Longlois appeared with her attorney, a witness, and a vocational expert ("VE") (Tr. p. 30). The ALJ found that, although Longlois has severe impairments of degenerative disc disease of the lumbar spine, diabetes mellitus, and depression (Tr. p. 14/289), she has the residual functional capacity to perform sedentary work with limitations of: lift/carry twenty pounds occasionally and ten pounds frequently, stand or walk for up to four hours, sit for up to six hours in an eight-hour workday, she is unable to perform complex work, and she must have

limited interaction with the public, working with things rather than people (Tr. p. 16/289).  The ALJ found there are jobs that exist in significant numbers that Longlois can do, such as bench worker, product sorter/inspector, credit clerk, and bookkeeping clerk (Tr. p. 25/289) and, therefore, Longlois was not disabled at any time from October 31, 2009 through the date of the ALJ's decision on March 16, 2012 (Tr. pp. 25-26/289).

Longlois requested a review of the ALJ's decision, but the Appeals Council declined to review it (Tr. p. 4/289) and the ALJ's decision became the final decision of the Commissioner of Social Security ("the Commissioner").

Longlois next filed this appeal for judicial review of the Commissioner's final decision.  Longlois raises the following issues for review on appeal (Doc. 11):

> 1. The Commissioner erred by not finding that Longlois suffered from an impairment or combination fo impairments which meet or equal a listing under the Social Security Act.
>
> 2. The Commissioner erred by ignoring the psychological consultative examiner, Dr. Lonowski, and subsequently not explaining why he took the position contrary to the consultative examiner's opinion that the plaintiff is disabled.
>
> 3. The ALJ erred by ignoring the opinion of the orthopedic consultative examiner requested by the ALJ post-hearing, Dr. Zum Brunnen, and subsequently not explaining why he took the position contrary to the post-consultative examiner's opinion that the plaintiff is disabled.

The Commissioner filed a brief in opposition to Longlois' appeal (Doc. 12), to which Longlois replied (Doc. 13).  Longlois' appeal is now before the court for disposition.

2

## Eligibility for DIB

To qualify for disability insurance benefits, a plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. 416(I), 423. Establishment of a disability is contingent upon two findings. First, a plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. 423 (d)(1)(A). Second, the impairments must render the plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. 423(d)(2).

## Summary of Pertinent Facts

Longlois was 41 years old at the time of her 2011 administrative hearing, had an associate's degree in Office Systems Accounting from college, and had past relevant work as an accountant for a hotel management company (2000-2006), an apartment manager (2007-2009), a car salesman (2006-2007), and a waitress (1995-1996) (Tr. pp. 138-139).

### 1. Medical Records

In January 2009, Longlois complained to Dr. Stephen Wheat, an internist, that she had increased low back pain which started about three days before, and that neither Soma nor heat relieved her pain (Tr. pp. 257-289). Dr. Wheat prescribed Toradol, Neurontin, and In July 2009, Dr. Wheat performed a nerve conduction study on

3

Longlois and found active left L4 or L5 radiculopathy, and right peroneal neuropathy at the ankle with an anterior tarsal tunnel syndrome (Tr. p. 244/289).  He prescribed Relefen (non-steroidal anti-inflammatory), Toradol and Neurontin (Tr. pp. 252, 254, 256/289).

On July 29, 2009, Longlois had a non-surgical interventional spine consultation with Dr. William S. Whyte II, a physical medicine and rehabilitation specialist, in July 2009 (Tr. pp. 216-218).  Dr. Whyte noted that Longlois' pain began in the low back one month ago, radiating into the right leg (but began in the left leg first) (Tr. p. 219/289).  Longlois reported her pain as 9/10 on average, 8/10 at best and 10/10 at worst, and it was provoked by sitting, standing, bending at the waist, coughing/ sneezing, driving, lying on her back and stomach, exercising, and walking (Tr. p. 219/289).  Longlois reported that no treatments or combinations or treatments had resulted in complete relief of pain, but she had not had any numbness, weakness, loss of function, or sleep impairment (Tr. pp. 219-289).  Dr. Whyte further noted that he had administered injections three time previously which provided relief for one year (Tr. p. 219/289).  Dr. Whyte also noted that Longlois denied any history of psychiatric disorder, had normal strength bilaterally in her upper and lower extremities, had a normal range of motion in her lumbar spine, had lumbar pain on palpation, and reduced lordosis in the lumbar spinal alignment (Tr. pp. 219-220/289).  MRIs of Longlois' lumbosacral spine showed lumbar radiculitis at L4-L5 bilaterally, a large annular fissure to

4

the L4-5 and L5-S1 disc, and internal disc displacement at L4-5 (Tr. p. 221/289). Dr. Whyte discussed the importance of ongoing physical therapy for pain palliation and general health with Longlois, as well as having right lumbar transforaminal epidural steroid injections at L4 and L5 (Tr. p. 218). Dr. Whyte stated that he did not see any evidence of aberrant drug seeking behavior at that time (Tr. p. 218).

On July 31, 2009, August 6, 2009, and August 20, 2009, Longlois received the transforaminal epidural injections at right L4 and L5 for treatment of her lumbar radiculitis (Tr. pp. 230-231).

In September 2009, Longlois reported that her back pain was still less intense than before (7/10) (Tr. p. 233). Dr. Whyte diagnosed multilevel degenerative disc disease, lumbago, and lumbar radiculitis, and discussed a lumbar discogram at L3-4, L4-5 and L5/S1 (Tr. p. 233). A discography was performed at L3-4, L4-5 and L5-S1 on September 21, 2009, and Dr. Whyte found internal disc disruption at L4/5 and L5-S1 with pain response (Tr. p. 234/289).

In October and November 2009, Longlois was evaluated by Dr. Troy M. Vaughn, a neurosurgeon (Tr. pp. 239-243/289). Dr. Vaughn noted that Longlois was 5' 7½" and weighed 199 pounds (Tr. p. 241/289). Dr. Vaughn reviewed Longlois' medical records and diagnosed disc degeneration and disc protrusions at L4/5 and L5/S1, severe intractable lower lumbar back pain with probable right lower extremity radiculopathy, and possible sacroilitis (Tr. pp. 242-243/289). Dr. Vaughn noted that Longlois had been given lumbar

5

facet and sacroiliac joint injections in October 2009, and did not have an improvement in her severe back pain that sometimes radiated into her right posterolateral thigh (Tr. pp. 239/289, 242/289). Dr. Vaughn diagnosed disc degeneration and disc protrusions at L4-5 and L5-S1, severe intractable lumbar back pain, and possible sacroilitis (Tr. p. 242/289), and was surprised that Longlois had not had at least some short term relief of symptoms with her injections; he also noted that she was not interested in surgery and had requested formal pain management (Tr. p. 243/289).

In February 2010, Dr. Wheat prescribed Alprazolam (anti-anxiety medication), Percocet for Longlois (Tr. p. 253/289).  In March 2010, Dr. Wheat prescribed insulin injections (Humalog) and Xanax for Longlois (Tr. pp. 248-289).  In July 2010, Dr. Wheat examined Longlois and diagnosed gastroesophageal reflux disease and lower back pain (Tr. p. 249/289).  Dr. Wheat prescribed Prilosec or Prevacid (Tr. pp. 249-289).  In April 2010, Dr. Wheat prescribed Zyrtec, Opana (pain medication), Diclofenac (nonsteroidal anti-inflammatory), Xanax, and insulin (Tr. p. 250/289).

In March 2010, Longlois was evaluated by Dr. Michael Dole, a pain medicine specialist (Tr. pp. 269-289).  Dr. Dole noted that Longlois' MRI showed disc herniation at L4-5 without significant nerve root impingement and severe degenerative disc disease; Dr. Dole found that pain interferes with Longlois' daily activities, sleep and concentration, but medication has helped improve her quality of life and functional ability (Tr. pp. 169-189).  Longlois reported taking Xanax about every other day for anxiety and insulin

for diabetes; Longlois weighed 192 pounds (Tr. pp. 269-289).  Dr. Dole found low back pain with right lower extremity pain, clinical symptoms consistent with radiculopathy but not confirmed by injections or EMG, opioid dependence without evidence of abuse, depressed mood, and diabetes mellitus requiring insulin therapy, and prescribed Mobic, MSIR, and Xanax (Tr. pp. 270-271/289).

In April 2010, Langlois weighed 188.6 pounds and complained of lower back pain and right leg pain (Tr. p. 267/289).  Dr. Wheat prescribed Orana, Xanax, and Voltaren (Tr. pp. 268-289).  In May, Longlois weighed 186.8 pounds; Dr. Wheat prescribed Xanax, Voltaren, MSIR, MS Contin, and Ambien CR (Tr. pp. 265-266/289).  In June 2010, Longlois complained of burning pain in her right leg; she weighed 186.4 pounds and Dr. Wheat prescribed Xanax, Voltaren, MSIR, and Neurontin (Tr. pp. 263-264-389).  In July 2010, Dr. Wheat discontinued the Neurontin and MS Contin, and prescribed Xanax, Voltaren, and Nucynta (Tr. p. 262/289).  In August 2010, Longlois reported that Nucynta was helping her pain a lot and she weighed 183 pounds (Tr. p. 259/289); Dr. Wheat prescribed MSContin, Nucynta, Xanax, and Voltaren (Tr. p. 260/289).

Longlois underwent a mental status examination with Daniel J. Lonowski, Ph.D., a psychologist, in October 2010 (Tr. p. 273/289).  Longlois reported weight loss over the last few months after gaining weight in March 2010 while taking pain medication (Tr. p. 273/289).  Longlois reported that she takes Morphine Sulfate IR, Morphine Sulfate ER, Alprazolam, Diclofenac, Omeprazole, Potassium, and Humalog, and uses an insulin pump (Tr. pp. 273-289).  Dr.

Lonowski found that Longlois has a mood disorder due to chronic pain, and her low back pain is at a point that prevents her from functioning normally (Tr. pp. 273-289). Dr. Lonowski diagnosed: Axis I-mood disorder due to chronic pain, a history of emotional and physical abuse as a child victim, a history of poly-substance dependence in sustained remission; Axis III-chronic pain, constipation, and overactive bladder; Axis IV-unemployment; and Axis V-Current GAF 70-75[1] (Tr. pp. 275-289). Dr. Lonowski found that Longlois is unable to perform work-related activities consistently, such as sitting, standing, walking, lifting, carrying, and handling objects, but she can see and hear normally, speak clearly, and travel independently, her level of intelligence was estimated in the average range, her memory functions were grossly intact, she could pay attention and concentrate normally,

---

[1] The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Axis I refers to clinical syndromes, Axis II to developmental disorders and personality disorders, Axis III to physical disorders and conditions, Axis IV to psychosocial stressors, and Axis V to the global (overall) assessment of functioning. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-35 (4th ed. 2000) ("DSM-IV-TR").

The Global Assessment of Functioning, or GAF, score represents Axis V of the Multiaxial Assessment system. The axial system of evaluation enables the clinician to comprehensively and systematically evaluate a client. Diagnostic and Statistical Manual of Mental Disorders, Text Revised, pp. 25-30 (4th ed. 2000) ("DSM-IV-TR"). GAF is a standard measurement of an individual's overall functioning level. The GAF score is a subjective determination that represents the clinician's judgment of the individual's overall level of functioning with respect to psychological, social and occupational functioning, on a hypothetical continuum of mental health-illness. A GAF of 71-80 means that, if symptoms are present, they are transient and expectable reactions to psycho-social stressors, and there is not more than a slight impairment in social, occupational, or school functioning.

her pace and persistence varied depending on her level of pain and mood disturbance, she can adapt to only simple physical challenges and those that are more physically demanding are beyond her abilities, she continues to interact socially despite her limitations, and she could receive and manage the funds if she was awarded benefits (Tr. pp. 275-289).

Longlois had a follow-up visit with Dr. Dole (pain medicine specialist) in November 2010 (Tr. p. 275/289).  Dr. Dole found Longlois has low back pain, opioid dependence, depressed mood, and diabetes mellitus Type II; Dr. Dole discontinued the morphine and prescribed Lortab, Miralax, Voltaren, and Xanax (Tr. pp. 275-289). Dr. Dole stated that Longlois was unable to work even in a sedentary physical demand capacity due to her severe pain, which often requires prolonged bed rest that is unexpected, she would have frequent and unexpected absences from work, would need frequent rest breaks during the day and need to lie down at unexpected intervals, is limited to lifting five pounds frequently and ten pounds occasionally, can bend and stoop occasionally, can stand and squat occasionally, and can grasp on a frequent basis (Tr. p. 275/289).

Longlois was also evaluated by Dr. James Zum Brunnen, an orthopedic surgeon, in September 2011.  Longlois reported that her back pain radiates to the right buttock, she can hardly stand for more than fifteen minutes, and she is unable to do any housework that involves stooping, bending or twisting (Tr. pp. 281-289).  Dr. Zum Brunnen found that Longlois has a normal range of motion in the

9

cervical spine and all peripheral joints, and no focal or gross motor weakness in either leg (Tr. p. 282/289).  Dr. Zum Brunnen noted Longlois' objective documentation of multilevel lumbar disc disease and right sciatica that can cause significant decrease in functional impairment (Tr. pp. 281-289).  Dr. Zum Brunnen stated that Longlois would have difficulty doing any work standing more than thirty minutes at a time, so her work would have to involve alternate sitting and standing, be sedentary with no lifting, with no sitting more than thirty minutes at a time, and no climbing ladders, stooping, twisting or bending (Tr. pp. 281-289).  Dr. Zum Brunnen further stated that Longlois' prognosis was not very good since she did not get relief from other types of treatments, and no back operation would quickly improve her functional ability though it might be necessary to help lower her pain level (Tr. p. 281/289).  Dr. Zum Brunnen diagnosed chronic lumbosacral pain, chronic pain syndrome, and lumbar degenerative disease with multilevel lumbar disc herniations that is not responsive to nonsurgical means, with borderline pain control (Tr. p. 281/289).

Dr. Zum Brunnen also filled out a medical source statement of ability to do work-related activities (physical) for Longlois (Tr. p. 282/289).  Dr. Zum Brunnen stated that Longlois can lift/carry up to ten pounds occasionally, and should never lift/carry more than that, can sit, stand or walk up to thirty minutes at a time and up to four hours total (each) in an eight-hour work day, can occasionally (up to 1/3 of an eight-hour day) reach, can continuously handle, finger, and feel, can occasionally push/pull,

can occasionally operate foot controls with the right foot and can frequently (13 to 2/3 of an eight-hour day) operate foot controls with the left foot, should never climb stairs, ramps, ladders or scaffolds, never balance or crawl, can occasionally stoop or crouch, can never work at unprotected heights or around moving mechanical parts, can occasionally operate a motor vehicle, and should avoid loud and very loud noise since it can worsen pain (Tr. pp. 283-287). Dr. Zum Brunnen stated that Longlois can shop, travel without a companion, ambulate without an assistive device, walk a block at a reasonable pace on rough or uneven surfaces, used standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare a simple meal and feed herself, care of her personal hygiene, and sort, handle, and use paper and files (Tr. p. 288/289).

### 2. 2011 Administrative Hearing

At her September 6, 2011 administrative hearing, Longlois testified that she was 41 years old, right-handed, 5' 7 ½" tall, weighed about 187 pounds, she had gained about ten pounds since she stopped working, she lives with her husband and her son, and she does not have any income (Tr. pp. 34-35/389). Longlois testified that her husband does not work because he is disabled following a heart attack and quadruple bypass, and her son is 19 years old and unemployed (Tr. pp. 34-35/289).

Longlois testified that she drives a standard transmission car for short distances (Tr. p. 35/289). Longlois testified that she has a college Associate's Degree in Office Systems and Accounting

(Tr. pp. 35-36/289).  Longlois testified that she last worked as an apartment manager, showing apartments, make lease agreements, clean the apartments, and do small repairs (Tr. p. 36/389).  Longlois also worked as a car salesman for about a year, and worked as an accountant for a hotel, taking care of petty cash, bank reconciliations, general ledgers, end-of-the-year audits, and depreciations (Tr. pp. 36-37/289).  Longlois testified that she stopped working because she injured her back when she lifted something (Tr. pp. 37-38/289).  Longlois testified that she immediately began going to her physician, then to Dr. Whyte, who gave her three injections which did not help (Tr. p. 38/289).  Longlois testified that she then started going to Dr. Vaughn, who gave her two injections that did not work, and told her that surgery would probably not fix her back (Tr. p. 38/289).  Longlois started going to Dr. Dole for pain management in 2010; her husband takes her because his office is about 45 minutes away from her home (Tr. pp/ 38-39/289).  Longlois testified that she is currently seeing Dr. Dole every three months (Tr. p. 39/289).  Longlois testified that her opioid dependence caused her bowels to back up, and the morphine did not work for her pain (Tr. p. 40/289).  Longlois testified that she began taking Nucynta (an opiate), which helps but does not take the pain away; her pain is in her low back and sometimes radiates down her right leg (Tr. p. 40/289).  Longlois testified that the pain goes down her right leg mostly when she sits or walks too much (Tr. p. 41/289).  Longlois testified that she can walk comfortably about five minutes, then

12

she has to sit or lay down (Tr. p. 41/289).  Longlois testified that Dr. Dole said he does not see a change for her in the near future (Tr. p. 41/289).  Longlois also testified that she is not allowed to do any exercises, but uses heat on her back at night, and switches between heat and ice (Tr. p. 42/289).

Longlois also takes Lortab, which is hydrocodone, for pain (Tr. p. 49/289).  Longlois testified that she takes Xanax (Alprazolam) for her nerves and frustration; she also stated that she smokes about one pack of cigarettes every four days (Tr. pp. 41-42, 50/289).  Longlois testified that she takes her "nerve pills" everyday (Tr. p. 51/289).

Longlois testified that, on a typical day, she is exhausted when she gets up in the morning because she was up every hour at night, she works two hours, then sits and watches TV, then gets up and walks a little bit, then sits again, then lays back down due to pain (Tr. p. 43/289).  Longlois testified that she may be able to lift a pound or two, but does not lift anything and does not carry light bags; her son does all of the lifting for her (Tr. p. 43/289).  Longlois testified that she really cannot cook; she can boil or microwave food because she can sit down while it cooks (Tr. p. 44/289).  Longlois testified that she cannot do laundry, but her son does it (Tr. p. 44/289).  Longlois testified that she used to have a lot of hobbies, but she cannot do them anymore; they used to ride motorcycles and play with her grandchildren (Tr. p. 44/289).  Longlois testified that two of her grandchildren visit all the time but her husband and son and the children's parents are there to

13

help with them (Tr. p. 44/289).  Longlois testified that she lies down during the day for 45 minutes to an hour intervals, as a change of position (Tr. p. 45/289).  Longlois testified that she gets along with everyone, but she is very short-tempered now (Tr. p. 45/289).

Longlois testified that she has two dogs (Tr. p. 45/289). Longlois testified that she does not do any yard work (Tr. p. 45/289).  Longlois testified that she drives her car about twice a week, usually to go to Wal-Mart, which is one and a half miles from her house; her husband goes with her (Tr. p. 42/289).  Longlois also goes to church on Wednesdays and Sundays (Tr. p. 46/289).

Longlois also testified that her elbow was swollen, which she thought was due to bursitis, and she had been diabetic for seven years and an insulin-pump dependent diabetic for three years (Tr. p. 46/289).  Longlois testified that her diabetes was caused by her being overweight and that, in 2009, she went to a personal trainer at her gym, but was injured doing an exercise (Tr. p. 47/289). Longlois testified she was fired from work n October 2009 because she missed too much work (Tr. p. 48/289).  Longlois testified that Dr. Whyte said she should not do physical therapy because it would aggravate her back pain (Tr. p. 48/289).

Longlois' husband, Gerald Ray Longlois ("Gerald"), testified that Longlois is unable to stand more than about five minutes at a time and cannot sit for more than about fifteen to twenty minutes at a time (Tr. p. 53/289).  Gerald testified that Longlois has to lie down or take medicine to relieve her pain (Tr. p. 52/289).

Gerald testified that Longlois starts chores at home but he usually has to finish them (Tr. pp. 52-53/289).   Gerald testified that Longlois' pain has gradually gotten worse over time (Tr. p. 53/289).   Gerald also testified that Longlois does not have any patience anymore; she has gotten more irritable due to pain (Tr. pp. 53-54/289).   Gerald testified that Longlois seems to be depressed because she gets upset about not being able to do anything any more (Tr. p. 54/289).   Gerald testified that Longlois is usually more irritable and depressed in the early morning (Tr. p. 54/289).

The VE testified that Longlois' past work as a hotel accountant or bookkeeper was sedentary and SVP 6, her past work in auto sales was light and SVP 6, her past work as a waitress was light and SVP 3, and her past work as an apartment manager was light and SVP 8 (Tr. pp. 55-56/289).

The ALJ posed a hypothetical involving a person of Longlois' age, education, and work experience, who can lift and carry 20 pounds occasionally and ten pounds frequently, who can stand/walk for four hours, sit for six hours, cannot do complex work due to emotional problems, requires limited interaction with the public, and is more comfortable working with things than with people (Tr. p. 56/289).   The VE testified that such a person would be able to work as a bench worker or production worker (SOC 51-9199, unskilled, sedentary, 28000 jobs in the U.S.), product inspector or sorter (SOC code 51-9061, unskilled, sedentary, 13000 jobs in the U.S.), credit clerk (SOC 43-4041, unskilled, sedentary, 16000 jobs

in the U.S.), or unskilled bookkeeping clerk (SOC 41-3031, unskilled, sedentary, 69,000 jobs in the U.S.) (Tr. pp. 56-57/289). The VE further explained that these jobs would allow the person to sand up intermittently and briefly stretch, but could not lay down for 45 minutes to an hour (Tr. p. 57/289).  The VE also testified that, if the person needed to lie down only about four times a month, she would not be able to do any of the jobs he listed (Tr. p. 57/289).

ALJ's Findings

To determine disability, the ALJ applied the sequential process outlined in 20 C.F.R. §404.1520(a) and 20 C.F.R. §416.920(a).  The sequential process required the ALJ to determine whether Longlois (1) is presently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix 1"); (4) is unable to do the kind of work she did in the past; and (5) can perform any other type of work.  If it is determined at any step of that process that a claimant is or is not disabled, the sequential process ends.  A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994), cert. den., 914 U.S. 1120, 115 S.Ct. 1984 (1995), citing Lovelace v. Bowen, 813 F.2d 55, 58 (5th Cir.1987).

To be entitled to benefits, an applicant bears the initial burden of showing that she is disabled.  Under the regulations, this means that the claimant bears the burden of proof on the first

16

four steps of the sequential analysis.  Once this initial burden is satisfied, the Commissioner bears the burden of establishing that the claimant is capable of performing work in the national economy. Greenspan, 38 F.3d at 237.

In the case at bar, the ALJ found that Longlois has not engaged in substantial gainful activity since October 31, 2009, and that she has severe impairments of degenerative disc disease of the lumbar spine, diabetes mellitus, and depression, but that she does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1 (Tr. p. 17/289).  The ALJ also found that Longlois is unable to perform her past relevant work as a hotel bookkeeper, auto salesperson, waitress, or apartment manager (Tr. p. 24/289).

At Step No. 5 of the sequential process, the ALJ further found that Longlois has the residual functional capacity to perform a modified range of sedentary work-she can lift/carry up to 20 pounds occasionally and 10 pounds frequently, stand or walk up to four hours and sit up to six hours in an eight-hour workday, cannot do complex work, must have limited interaction with the public, and must work with things rather than with people (Tr. p. 19/289).  The ALJ also found that the claimant is a younger individual with at least a high school education and that transferability of work skills is not material to the disability determination (Tr. p. 21/289).  The ALJ concluded that there are a significant number of jobs in the national economy which Longlois can perform, such as bench worker, product sorter/inspector, credit clerk, and

bookkeeping clerk (Tr. p. 25/289) and, therefore, Longlois was not under a "disability" as defined in the Social Security Act at any time from October 31, 2009 through the date of the ALJ's decision on March 16, 2012 (Tr. pp. 15-16/289).

<u>Scope of Review</u>

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. <u>McQueen v. Apfel</u>, 168 F.3d 152, 157 (5th Cir. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. <u>Falco v. Shalala</u>, 27 F.3d 160, 162 (5th Cir. 1994), citing <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. <u>Singletary v. Bowen</u>, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, reweigh evidence, or substitute its judgment for that of the fact-finder. <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987); <u>Dellolio v. Heckler</u>, 705 F.2d 123, 125 (5th Cir. 1983).

The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court.  Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981).  Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).  The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125.  But to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence."  Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

Law and Analysis

### Issue 1 - Listing 1.04

First, Longlois contends the Commissioner erred by not finding that she meets or equals Listing 1.04, Disorders of the Spine.[2] The ALJ did not consider Listing 1.04 (Tr. pp. 17-18/289).

If the claimant's condition is listed, or is medically equivalent to a listed impairment, the claimant is conclusively determined disabled.  Cieutat v. Bowen, 824 F.2d 348, 351 n.1 (5th Cir. 1987).  Also, Selders v. Sullivan, 914 F.2d 614, 619 n. 1 (5th Cir. 1990).  A claimant has the burden of proving that his condition meets or equals an impairment listed in Appendix 1. Sullivan v. Zebley, 493 U.S. 521, 110 S.Ct. 885, 891-92 (1990).

---

[2] Longlois' brief erroneously cited Listing 1.02 (major dysfunction of a joint characterized by gross anatomical deformity, with involvement of one major peripheral joint). However, she argues that she meets the listing for "Disorders of the spine," which is Listing 1.04.

See also, <u>Selders v. Sullivan</u>, 914 F. 2d 614, 619(5th Cir. 1990). For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify.  <u>Sullivan v. Zebley</u>, 110 S. Ct. at 891.

Listing 1.04 deals with nerve root compression, spinal arachnoiditis, and lumbar spinal stenosis.  Longlois has not specified which part of Listing 1.04 she is attempting to prove she meets.  However, since there is not evidence of arachnoiditis or stenosis, it is assumed that Longlois is referring to nerve root compression.  The relevant part of Listing 1.04 states:

> 1.04 Disorders of the spine (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord, with:
> A.  Evidence of nerve root compression characterized b neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back positive straight leg raising test (sitting and supine);... .

MRIs of Longlois' lumbosacral spine showed lumbar radiculitis at L4-L5 bilaterally, a large annular fissure to the L4-5 and L5-S1 disc, and internal disc displacement at L4-5 (Tr. p. 221/289).  A discography showed disc disruption at L4/5 and L5-S1 with pain response (Tr. p. 234/289).  However, there is no evidence of limitation of motion of Longlois' spine, nor is there evidence of motor loss or atrophy.  Therefore Longlois has not carried her burden of proving she meets or equals Listing 1.04.

This issue is meritless.

Issue 2 - Psychological Exam

Next, Longlois contends the Commissioner erred by ignoring the psychological consultative examiner, Dr. Lonowski, and subsequently not explaining why he took the position contrary to the consultative examiner's opinion that the plaintiff is disabled.

Dr. Lonowski did not find that Longlois is "disabled." Dr. Lonowski found that Longlois is unable to perform work-related activities consistently, such as sitting, standing, walking, lifting, carrying, and handling objects, but she can see and hear normally, speak clearly, and travel independently, her level of intelligence was estimated in the average range, her memory functions were grossly intact, she could pay attention and concentrate normally, her pace and persistence varied depending on her level of pain and mood disturbance, she can adapt to only simple physical challenges and those that are more physically demanding are beyond her abilities, she continues to interact socially despite her limitations, and, if she was awarded benefits, she could receive and manage the funds (Tr. pp. 275-289).

The ALJ is required to give substantial weight to the doctors' medical findings, not to their opinions about the actual availability of jobs for a person. Loya v. Heckler, 707 F.2d 211, 214 (5th Cir. 1983). Thus, the ALJ could properly discount a medical assessment stating that Longlois is completely disabled.

Although the ALJ did not mention Dr. Lonowski's 2010 evaluation when he considered whether Longlois meets Listing 12.04

(Affective Disorders) (Tr. pp. 17-18/289), he mentioned Dr. Lonowski's evaluation when he discussed Longlois' residual functional capacity; the ALJ correctly discounted Dr. Lonowski's opinion as to Longlois' physical residual functional capacity as beyond his area of expertise, but noted Dr. Lonowski's opinion as to Longlois' mental residual functional capacity (Tr. p. 23/289). Dr. Lonowski diagnosed Longlois with mood disorder due to chronic pain (Tr. p. 275/289).

Therefore, the ALJ did not fail to consider Dr. Lonowski's opinion and did not err in failing to find Longlois is disabled.

This issue is meritless.

Issue 3 - Dr. Zum Brunnen's Opinion

Finally, Longlois contends the ALJ erred by ignoring the opinion of the orthopedic consultative examiner, Dr. Zum Brunnen, requested by the ALJ post-hearing, and subsequently not explaining why he took the position contrary to the post-consultative examiner's opinion that the plaintiff is disabled.

The ALJ fuond that Longlois has the residual functional capacity to perform sedentary work with limitations of: lift/carry twenty pounds occasionally and ten pounds frequently, stand or walk for up to four hours, sit for up to six hours in an eight-hour workday, unable to perform complex work, and must have limited interaction with the public, working with things rather than people.

Dr. Zum Brunnen found that, at work, Longlois' would have to be able to alternate sitting and standing, and the work would have

22

to be sedentary with no lifting, not require sitting more than thirty minutes at a time, and not involve climbing ladders, stooping, twisting or bending (Tr. pp. 281-289). Dr. Zum Brunnen further found that Longlois can lift/carry up to ten pounds occasionally and should never lift/carry more than that, can sit, stand or walk up to thirty minutes at a time and up to four hours total (each) in an eight-hour work day, can occasionally (up to 1/3 of an eight-hour day) reach, can continuously handle, finger, and feel, can occasionally push/pull, can occasionally operate foot controls with the right foot and can frequently (13 to 2/3 of an eight-hour day) operate foot controls with the left foot, should never climb stairs, ramps, ladders or scaffolds, never balance or crawl, can occasionally stoop or crouch, can never work at unprotected heights or around moving mechanical parts, can occasionally operate a motor vehicle, and should avoid loud and very loud noise since it can worsen pain (Tr. pp. 283-287).

Dr. Dole stated that Longlois was unable to work even in a sedentary physical demand capacity due to her severe pain, which often requires prolonged bed rest that is unexpected, she would have frequent and unexpected absences from work, would need frequent rest breaks during the day and need to lie down at unexpected intervals, is limited to lifting five pounds frequently and ten pounds occasionally, can bend and stoop occasionally, can stand and squat occasionally, and can grasp on a frequent basis (Tr. p. 275/289).

The ALJ did not explain why he found Longlois can sit for up

to six hours in an eight-hour day, when no physician found she can sit for more than four hours total and would have to be able to alternate sitting and standing.

ALJs have been warned by the courts against "playing doctor" and making their own independent medical assessments.  Frank v. Barnhart, 326 F.3d 618 (5th Cir. 2002).  An ALJ does not have the medical expertise to substitute his opinion as to the nature of a claimant's medical complaints for the supported and unrefuted diagnosis of the treating physician, particularly one who, as in this case, is a specialist.  See Frank v. Barnhart, 326 F.3d 618 (5th Cir. 2002); Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir. 1990), cert. den., 502 U.S. 901, 112 S.Ct. 278 (1991).

Since the ALJ's finding that Longlois can sit for six hours in an eight-hour day is not supported by any medical or other evidence, the ALJ's hypothetical to the VE was erroneous and his finding that there are jobs that Longlois can do is not supported by substantial evidence.

Since substantial evidence does not support the conclusions of the ALJ and the Appeals Council, their decision is incorrect as a matter of law.  However, this does not entitle Longlois to a decision in his favor based upon the existing record.  The record is simply inconclusive as to whether there are any jobs existing in sufficient numbers in the national economy which Longlois can perform, given her true impairments.  Therefore, Longlois' case should be remanded to the Commissioner for further proceedings.

24

<u>Conclusion</u>

Based on the foregoing discussion, IT IS RECOMMENDED that the final decision of the Commissioner be VACATED and that Longlois' case be REMANDED to the Commissioner for further proceedings.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **fourteen (14) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  No other briefs  (such as supplemental objections, reply briefs etc.) may be filed. Providing a courtesy copy of the objection to the magistrate judge is neither required nor encouraged.  Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN fourteen(14) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 16 day of July 2014.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE